Howard Mishkin, Colvin, Mishkin, Basseches & Mandelbaum, New York City, for defendants.

---

**GEMVETO JEWELRY COMPANY, INC., Plaintiff,**

v.

**JEFF COOPER INCORPORATED and Jeff Cooper, individually, Defendants.**

No. 81 Civ. 3447 (KC).

United States District Court, S.D. New York.

Sept. 14, 1988.

grounds, and we therefore voice no opinion as

## OPINION AND JUDGMENT

CONBOY, District Judge.

The complaint in this action was filed on June 4, 1981. The subsequent duration and course of the litigation has been extraordinary. The civil docket sheet in the matter reflects almost two hundred entries, approximately one hundred fifty filings, and thirty separate orders entered by the District Court. The late Honorable Edward Weinfeld presided over two trials in the case, a Magistrate conducted proceedings on motions between the two trials that lasted for almost a year, and an appeal was litigated in the United States Court of Appeals for the Federal Circuit.

## BACKGROUND

The parties in this action are manufacturers and sellers of high fashion jewelry, and are in general, though not in direct, competition. Gemveto's customers include

to its merits.

the nation's leading upscale jewelry retailers, such as Tiffany, Cartier and Van Cleef & Arpels, its pieces are generally 18 carat gold, and its gemstones are of the highest quality. Cooper's line of jewelry is more moderately priced, is generally of 14 carat gold and its gemstones are of a good but lesser quality.

The initial complaint in the action alleged only unfair competition under New York statutory and common law. An amended complaint asserted additional causes of action for infringement of two patents and three copyrights, and violation of Section 43 of the Lanham Act. The defendants counterclaimed for, *inter alia*, damages for interference by plaintiff with customer relationships by making knowingly baseless patent and copyright claims.

The first trial of the case was conducted, without a jury, during late June and early July, 1982. The Court rendered its decision on July 16, 1983. In an opinion reported at 568 F.Supp. 319 (S.D.N.Y.1983), the Court held that one patent owned by the plaintiff (the " '245 patent") was valid, but not infringed by the defendants; that the plaintiff's other patent (the " '818 patent") was invalid for obviousness; that the plaintiff's three copyrights were invalid; and that the plaintiff's jewelry settings were functional, and therefore not subject to Lanham Act protection. The Court, however, did find for the plaintiff on the question of unfair competition under New York Law, concluding essentially that defendants had copied the plaintiff's ring settings. The Court granted injunctive relief therefrom. The defendants were permanently enjoined from selling or offering for sale "any piece of jewelry which is confusingly similar in appearance to any piece of Gemveto jewelry, having nonfunctional attributes that are original with Gemveto." *See,* Judgment Order and Injunction, entered on July 26, 1983. The Court dismissed the defendants' counterclaims of unfair competition.

Nine days later, on August 4, 1983, the defendant filed a motion for reconsideration of the Court's ruling and clarification of the scope of the injunction, and the plaintiff about this time moved to hold the defendant in contempt for asserted violations of the injunction. These matters were referred to Magistrate Buchwald who, after protracted hearings, issued a Report and Recommendation to the Court on January 26, 1984. The Magistrate, in substance, concluded that, except for the ring settings, which had been found by the Court to be either not patented, or patented but not infringed, there were no other original aspects of the plaintiff's jewelry which could be legally protected from copying by the defendant, that the injunction was therefore vague, and that the contempt asserted against the defendant was not justified.

On May 4, 1985 the plaintiff moved to vacate the finding of invalidity of the '818 patent on the grounds of newly discovered evidence, and petitioned for a new trial on that issue. On July 19, 1985 the Court issued an opinion, reported at 613 F.Supp. 1052 (S.D.N.Y.1985), accepting the Magistrate's recommendations that the injunction was in need of clarification and that defendant should not be held in contempt. The Court refused, however, to modify its previous holding that the defendant had violated New York's unfair competition law. Furthermore, the Court granted the plaintiff's motion for a new trial on the issue of validity of the '818 patent.

In its 1985 opinion, the Court significantly revised and broadened the findings of fact in its 1983 judgment of liability against the defendant on the claim of unfair competition under New York common law. Principally, there were more explicit findings on Cooper's attempts to palm off plaintiff's designs as being its own; "predatory practices" engaged in by the defendants; and a deliberate attempt by the defendants to deceive the public. The decision enjoined the defendants "from selling or offering for sale any item of jewelry that is confusingly similar in appearance to any item of Gemveto jewelry such that the sale or offer for sale of such item, by any method or means, is calculated to deceive the public as

to its source." [1]

On September 9, 1985 the Court referred the injunctive remedy issue back to Magistrate Buchwald to hear and report "with respect to the items of jewelry manufactured or sold or offered for sale by defendants which are confusingly similar in appearance to any item of plaintiff's jewelry." On October 18, 1985 after further hearings, the Magistrate submitted a Report and Recommendation, identifying hundreds of rings, bracelets and necklaces in the defendants' inventory as "confusingly similar" to those of the plaintiff. The proposed form of judgment on the injunction differed from the Court's 1983 order in that it prohibited the sale of confusingly similar items by any method "calculated to deceive the public as to its source" (annexed proposed order, p. 3, Report and Recommendation of Magistrate Buchwald, October 18, 1985).

Defendants objected to the Report and Recommendation and on October 28, 1985 asked the Court to reject it, asserting that, in effect, the Magistrate had ruled "that any sale by the defendants of jewelry which is confusingly similar to the plaintiff's jewelry is, ipso facto, calculated to deceive the public as to its source" (Affidavit of Howard C. Miskin, dated October 28, 1985). The defendants further complained that the injunction as devised by the Magistrate was so broad that it covered in excess of 80% of defendants' inventory, that it covered designs long in the public domain, that it covered settings that the Court itself had found were not protected by either patent or copyright, and that immediately after the Court's second opinion of July 19, 1985 the defendant Cooper had undertaken "to have labels as well as my logo stamped on my products made for attachment to all of the jewelry I sell. The labels clearly identify Jeff Cooper as the source of the jewelry and prevent any likelihood of confusion as to source of origin." (Affidavit of Jeff Cooper, dated October 29, 1985).

On December 5, 1985 the Court denied the defendants' motions challenging the Magistrate's Report, accepted it, and entered the revised injunctive order, denying the defendants a stay pending appeal.

Exactly one year later, on December 5, 1986 the United States Court of Appeals for the Federal Circuit vacated the injunction and remanded the case for further proceedings, finding that, because the designs enjoined were determined simply by comparing appearance, the focus of the injunction was "protecting the designs of the jewelry rather than on preventing unfair methods of selling the jewelry." *Gemveto Jewelry Company, Inc. v. Jeff Cooper, Inc,* 800 F.2d 256, 259 (Fed.Cir.1986). The case was sent back to the District Court "for consideration of an appropriate re-wording of the injunction to specify Cooper's acts which would, if not enjoined, constitute palming off under New York common law." *Id.* A revised injunction under this mandate was never entered.

The second trial on the validity of the '818 patent began on September 14, 1987, two years after the initial judgment had been vacated, and concluded on September 16, 1987. Judge Weinfeld's lamentable illness and death occurred prior to final judgment being rendered on the matter, and on March 3, 1988 both parties, by stipulation, agreed to waive any rights to a retrial of the case, and submitted it for decision to this Court, upon condition that supplemental post-trial briefs would be received and oral argument allowed. On August 19, 1988 oral argument was heard. This opinion constitutes the findings of fact and conclusions of law of the Court.

## THE VALIDITY OF THE '818 PATENT

In his initial ruling declaring the '818 patent invalid, Judge Weinfeld concluded that both the '245 and '818 patents address Gemveto's methodology of setting gemstones in jewelry. The '818 teachings were found to be obvious in light of the '245, because of substantial similarities between the two, notwithstanding significant improvements evident in the '818. Standing alone, however, this finding was not sufficient to invalidate the '818 because the

---

1. *Gemveto Jewelry,* 613 F.Supp. at 1064.

plaintiff had filed with the patent office a terminal disclaimer, which rendered the then pending '245 application not prior art with respect to the '818. The Court determined, however, through advertising materials received at the first trial, that the plaintiff had introduced to the public the teachings of the '245 by offering for sale ruby and sapphire rings embodying those teachings, and had done so more than one year prior to the filing date of the '818 patent. Accordingly, the Court held, the terminal disclaimer notwithstanding, that the rings were prior art references as against the '818, that the '818 teachings were therefore obvious, and that the '818 patent was necessarily invalid under 35 U.S.C. § 103.[2]

It is therefore clear, and Judge Weinfeld declared, that "the finding that the ruby and sapphire rings employed the '245 teachings was the underpinning of the holding that the '818 was invalid."[3] In granting plaintiff's motion for a new trial solely on the issue of the '818 patent claim, Judge Weinfeld found, under Fed.R.Civ.P. 60(b)(2), that plaintiff had presented newly discovered evidence that warranted vacating the judgment on the question of '818's validity, and retrying that patent claim de novo.

In substance, the newly discovered evidence may be described in the following terms. At the first trial, Jean Vitau, the plaintiff's principal inventor and founder, testified that both the ruby and sapphire rings employed the teachings of the '245 patent. This testimony was neither equivocal nor ambiguous. Mr. Vitau had before him and had reviewed prior to his testimony what he described as the design model of the sapphire ring. He did not have before him, and had asserted that he had been unable to locate, after protracted, vigorous and diligent searching of the entire Gemveto premises, the design model for the ruby ring. Almost twenty months after the trial, and nine months after the entry of judgment, Mr. Vitau asserted that

the missing ruby ring model had fortuitously turned up. Upon examining it, he concluded that he had been in error when he had earlier testified that the ruby and sapphire rings, pictured in the advertisements introduced at the first trial to establish public disclosure of the relevant ring settings, were based in the teachings of the '245 patent. Mr. Vitau claimed that the newly discovered ruby ring model lacked certain features embodied in the teachings of the '245 patent and that, accordingly, it did *not* have a basis in the '245.

In his motion papers for a new trial, Mr. Vitau asserted that the sapphire ring model, which he had had before him at trial, was, upon comparison with the newly discovered ruby ring model, similar to it and therefore dissimilar to the teachings of the '245. The consequence of Mr. Vitau's repudiation of his first trial testimony on this central, decisive question, should it be accepted by the Court in the second trial, then frees the '818 patent of the previous finding of obviousness, and leads to further inquiry on claims by the defendant of other asserted infirmities in the patent, and claims by the plaintiff of infringement by the defendant.

In granting the new trial, Judge Weinfeld observed that "whether or not the proffered evidence would produce a different result upon a new trial of the '818 patent claim is a close question."[4] Nevertheless, he concluded that, in the interest of justice, a new trial should be granted.[5]

The second trial proceeded over three days, and involved the examination of three plaintiff's witnesses and two defendants' witnesses. Two-thirds of the trial record deals with the examination of Mr. Vitau, the plaintiff's principal witness. The plaintiff also offered the testimony of Martin Adelman, a patent lawyer, on procedures of the patent and trademark office, and called the defendant Jeff Cooper briefly and principally on the infringement issue. The defendant called Jacques Linacher, an expert

**2.** *Gemveto Jewelry,* 568 F.Supp. at 325–28.

**3.** *Gemveto Jewelry,* 613 F.Supp. at 1057.

**4.** *Gemveto Jewelry,* 613 F.Supp. at 1059.

**5.** *Id.*

on model making in the jewelry manufacturing business, and Cintone Chrissan, a maker of jewelry mountings. Both sides resubmitted substantial portions of the first trial record on the retrial.

Before proceeding to a discussion of the evidence at the second trial, two observations should be made about the plaintiff's motion papers urging a new trial. Plaintiff's papers strongly implied that the newly discovered ruby ring model was in fact the model for the advertised ruby ring identified at the first trial and illustrated in defendant's Exhibit F–4. At the second trial, however, Mr. Vitau's testimony in substance constituted a concession that the newly discovered model was not the model for any piece of jewelry referred to in the first trial.

More importantly, it should be noted that plaintiff's motion papers made reference to only one newly discovered model, that for the ruby ring. At the second trial, a second "new" model, this assertedly for the sapphire ring, was produced, having been fortuitously discovered at the same time and in the same place as the new ruby ring model. No adequate explanation was given as to why no mention had been made of this second model in the plaintiff's new trial motion papers [Tr. II, pp. 169–76]. I note, parenthetically, on this point that in granting the motion for a new trial, Judge Weinfeld had expressed reservations on the plaintiff's position regarding the question of the sapphire ring, since all that the Judge had before him in the way of new evidence was the assertedly newly found ruby ring model. The judge observed that "Mr. Vitau now claims the construction of the sapphire ring was identical to that of the ruby ring, which was not based upon the '245, *despite marked differences in the shapes of the two rings.*" [6]

It is helpful at this point to describe briefly the substance of the '245 patent. It embraces a ring setting of adjacent, parallel rows of stones fixed by notches, or declivities, cut out in'the walls separating the rows of gems. A bar or wire is mounted along the top of each wall, concealing the pocket beneath it caused by each cut out. These pockets allow for exceedingly close setting of the gems, creating an effect of massed brilliance, and the gems are anchored in place by the binding contact of the bar or wire on the facing edges of the contiguous stones. The wall cut outs, or declivities, are a chief characteristic or feature of the '245 patent. The newly discovered ring models manifest conventional channel settings, not embraced by the '245 patent, and long in the public domain.

In his testimony at the first trial, Mr. Vitau insisted that wall settings without his cutouts (as in the '245 patent) cannot be used to set multiple stones [Tr. I, p. 338–9, 343–4]. In the second trial, Mr. Vitau asserted that the newly found ring models, which because their settings lack cutouts are distinguishable from the '245 patent, were in fact the models for the ruby and sapphire rings illustrated in the trade advertisements at the heart of the case. [Trial II, Tr. p. 36–37].

In the second trial, the plaintiff offered no revision or repudiation of the first trial testimony of its sales manager and Vice President, Leonard Gottlieb. Mr. Gottlieb asserted flatly that the ruby and sapphire rings that appeared in the advertisements were rings listed on certain inventory cards by control numbers; that he displayed and sold these rings at trade shows; that he knew in detail their construction and characteristics; that he recognized the rings in the advertisements and identified them in the inventory card records; that he examined the sapphire ring model used by Mr. Vitau in the first trial and connected it to a specific inventory card model; and that, most importantly, the bar setting of the '245 patent had been used on both the ruby and sapphire rings in the advertisements, and not the channel wall settings claimed by Vitau in the second trial. [Tr. I, p. 1326–1333].

In his testimony during the first trial, Mr. Vitau asserted that he never utilized channel construction for setting multiple stones before the '245 patent [Tr. I, p. 339].

6. *Gemveto Jewelry,* 613 F.Supp. at 1059 (emphasis added).

In the second trial, he testified that he had indeed used such construction for the rings in the advertisement [Tr. II, p. 11].

At the second trial, a newly discovered inventory card was produced for the newly discovered ruby ring model. The card establishes that this new model was completed on July 17, 1978 [Tr. II, p. 124–25]. This date is critical in determining whether that model was finished in sufficient time to have been the basis for the jewelry photographed for publication and distribution by July 28, 1978. The circular in which the advertisement in question was published was received in the Patent and Trademark Office on July 28, 1978 [Tr. I, p. 242]. Obviously, the ad had to be submitted well in advance of that date for publication, and ultimate distribution. Furthermore, a finished ring had to be sent to the photographer to be photographed, and the finished copy then sent to Chilton Publications in Radner, Pennsylvania, where the 300 page publication was assembled and printed. I note that the Plaintiff's ad agency was situated in Dallas, Texas. To ship the finished rings to the photographer, forward the photos to the ad agency in Texas, send the ad copy containing the photograph to the publisher, prepare the ad for publication, publish the ad, distribute it to Washington, D.C., and accomplish all this labor in eleven days is, this Court may infer from the dates in evidence, highly improbable.

On the origins of the sapphire ring, Mr. Vitau has testified as follows: during a deposition prior to the first trial, apparently unaware of the significance of the date of the advertisement in issue, he flatly stated that the sapphire ring pictured there was covered by his '818 patent (a refinement of the '245) and the ruby ring was covered by his '245 patent [Tr. II, p. 94–96]. At the first trial, he asserted, unmindful of his attorney's earlier acquiescence in a double patenting rejection, that both the ruby and sapphire rings were based in the '245 patent. To buttress his corrected testimony, Mr. Vitau produced a model for the sapphire model, and categorically insisted that the model, which he examined both before and upon taking the witness stand, unequivocally supported his conclusion, that he, who had, after all, both made the ring and obtained the '245 patent, had based his sapphire ring in the teachings of his '245 patent. [Tr. I, p. 235–240; 295; 348–354]. At the second trial, Mr. Vitau produced an entirely different "newly discovered" model for the sapphire ring, not even mentioned in his motion for a new trial, and asserted that the sapphire ring in the advertisement was not based in the '245 patent, but in an inferior method of wall mounting known in the trade long prior to the '245.

The plaintiff's regular business procedure included the maintenance of inventory cards on each design model developed. These cards preserve information relating to date made, sales figures, construction design, and other aspects of the piece's history and value. Prior to the first trial, a subpoena was issued requiring the production of such records that related to the rings illustrated in the advertisement in issue. Inventory cards responsive to the subpoena were produced, and placed collectively in evidence at the first trial as Defense exhibit Y9, A through H. [Tr. I, p. 233–35]. At the second trial, the plaintiff produced a new and different set of inventory cards, never produced in the first trial, introduced them as plaintiff's exhibit P–202, 203 and 203A [Tr. II, p. 40–41], and asserted that *they* were the house records of the ruby ring illustrated in the advertisement.

Mr. Vitau testified that the inventory card marked P–202, corresponding to model 4.016, related to that advertised ruby ring. The inventory card in question, however, lists a prefix "S" on the listed model number, indicating sapphire. Mr. Vitau, when asked about this, asserted that the ring photographed in the advertisement was in fact the "S" ring described on the inventory card but that he, Mr. Vitau, had switched a ruby for a sapphire before shipping it to the photographer [Tr. II, p. 47].

As already indicated, Mr. Vitau had asserted in the first trial that exhibit Y–9A, a different inventory card, corresponding to model 4.011, was the house record of the advertised ruby ring. In response to Judge

Weinfeld's direct questioning at the first trial, Mr. Vitau said he was certain that model 4.011 corresponded to the advertised ring because it was "the first model of that ring produced in my shop, that is the ring [shown on the ladies (sic) finger in Exhibit F–4]" [Tr. I, p. 245]. This assertion was repeated by Mr. Vitau two years later in his May 2, 1984 affidavit in support of the motion for a new trial, and, according to his later position during the second trial, *after* the newly discovered ruby ring had fortuitously turned up. In other words, Mr. Vitau in his motion was continuing to assert that the photographed ruby ring was model 4.011, and that the newly discovered model was also model 4.011.

Mr. Vitau's testimony at the second trial accordingly constitutes a repudiation of sworn testimony on two prior occasions, the second *after* the proffered newly discovered evidence was discovered, that the pictured ruby ring is model 4.011. What is the basis for the testimonial revision, from model 4.011 (Exhibit DX Y–9A First Trial), to model 4.016 (Exhibit PX 202 Second Trial), offered by Mr. Vitau? In considering this question, it is critical to emphasize that Mr. Vitau does not now assert that he was mistaken, but that *he knew*, during his first trial testimony, that the illustrated ring was model 4.016, and not model 4.011 [Tr. II, p. 153].

With respect to the model for the sapphire ring, Mr. Vitau at the first trial insisted in the most determined, indeed almost belligerent, language, that a model in hand, marked in evidence as P–23R, which unmistakably had wall cutouts characteristic of the '245 patent, was the model for the photographed and advertised sapphire ring. In the second trial, Mr. Vitau reversed himself and insisted that the relevant model was the newly discovered PX–206 without the decisive and forbidding wall cutouts, and explained that he had been confused by counsel and inattentive to details [Tr. II, p. 179].

If the two newly discovered ring models, both *without* wall cutouts, were in fact the models of the ruby and sapphire rings pho-

tographed, advertised and offered for sale by Gemveto, as now claimed by Mr. Vitau, then such rings, having such inferior construction, were subject to the stones popping out, [Tr. II, p. 26], according to Mr. Vitau. Such defects would, no doubt, have led to recalls of such rings, each valued at several thousand dollars. Mr. Vitau, when confronted with his previous testimony on the inadequacy of wall mountings without the '245 cutouts, asserted that such recalls because of stone instability had in fact been made in connection with the advertised rings. When records of such recalls based upon that problem were demanded, however, he could produce none [Tr. II, p. 31, 206–208]. Although some inventory cards contain the notation "return," there is no such notation recorded in connection with stone instability.

What may one say, based upon this record, of the credibility of Mr. Vitau? One should first observe that he is an exceedingly intelligent and highly sophisticated man. He is widely celebrated in his field. Indeed, he has been referred to in one of Judge Weinfeld's opinions as "a genius in designing, styling and producing fine quality jewelry." [7]

He has demonstrated, it must be said, a remarkable adroitness in shaping testimony, over a protracted and dizzying course of litigation, to accommodate short term, ad hoc tactical necessity. Near the end of the second trial, in his final words on the witness stand put directly to Judge Weinfeld, after years of combat, two trials, an appeal, many motions, voluminous depositions, endless shadings and revisions of answers given, he said, with more than a trace of piety:

> Your Honor, as I believe you know by now, I have been working at the [jewelry] bench for over 45 years. I myself made all the earlier models for these patents and all the research for these patents. I could, therefore, have made, redone these models from the very beginning very easily. But no matter how important the patent is to me I couldn't

7. *Gemveto Jewelry*, 568 F.Supp. at 323.

**1092**

bring myself to do that and I guess this answers the question of Mr. Miskin [defendant's Counsel]" [Tr. II, p. 229–30].

Though such self-edifying declarations of virtue are almost always unconvincing, such is particularly the case here, since in the evidentiary context of the preparation for the first trial the "new" models were hardly relevant, and certainly not decisive. Indeed, even after the first trial, the broad injunctive relief expected by the plaintiff on the non-patent grounds may have obviated any need for "new" models. The suggestion, in essence, that an assertion of recent fabrication can effectively be met by proclaiming an opportunity, not seized, to fabricate at a remote point in the conflict, is simply untenable, where, as here the necessities of proof have so markedly changed over time.

Moreover, it ought to be borne in mind that the ring models, designs, specifications, and characteristics that have proliferated so widely in this case are the essential notes, tones, keys and clefs of Mr. Vitau's skill, artistry, and creativity. One cannot read the considerable record of his complete testimony over the full course of this eight year litigation without concluding that Mr. Vitau is a man with a profound grasp of the master jeweler's art and craft. It is, accordingly, noteworthy that when confronted with inconsistency in his testimony, he sporadically sought refuge in the conventional gambits of the evasive witness: drawing distinctions without meaning, blaming the examiner for confusing him, pleading inattention to detail, exaggerating the length of prior examination, conceding mistakes without defining with precision their substance, asserting that simplification for the layman led to distortion of the expert's view, claiming the existence of a language barrier, and qualifying concessions where qualification is inapposite.

But these occasional liberties taken from the duty of a witness cannot, by themselves, answer the question of where the truth lies on the issue of whether the illustrated rings had the characteristics of the '245 patent. More probative on the point is the failure of other testimony or records to corroborate Mr. Vitau's account of and rationale for the "newly" discovered models given in the second trial. Moreover, it is undisputed that his second trial testimony is flatly contradicted by his first trial testimony which was characterized by firmness, direction, precision, and persistence. Mr. Vitau's own Vice President, intimately familiar with the illustrated rings, testified categorically in the first trial, that the rings without doubt had the characteristics of the '245 patent. No modifications or revisions of his testimony were offered by the plaintiff in the second trial. The inventory card and model number evidence leaves grave doubt that the "newly" discovered models were in fact the models for the advertised rings. The absence of any records, accounts, notations, bills of sale, work orders, shipment papers, customer names or even a shred of documentation supporting Gemveto's claimed recall and replacement caused by the gem popping defect inherent in the structure of the asserted non-'245 patent rings, further undermines the credibility of Mr. Vitau. The production at the second trial of a second, newly discovered model, that for the sapphire ring, which *had not been mentioned* in the plaintiff's motion for a new trial, and which had been discovered, according to the plaintiff, at the same time as the "new" ruby ring model, which *was mentioned* in the motion, is especially troublesome. After all, Judge Weinfeld had specifically expressed skepticism in his opinion granting a new trial, about the viability of the claim based upon the single "new" ruby model.[8] The conclusion is irresistible that the discovery of the "new" sapphire ring model is a *deus ex machina*.[9]

As convincing as the aggregate of these elements is, however, the ultimate issue turns upon something more. I refer to the

8. *Gemveto Jewelry*, 613 F.Supp. at 1059.

9. A Roman term derived from the Greeks, originally applied to a device of classical dramatists that appears or is introduced suddenly and unexpectedly and provides an artificial or contrived solution to an apparently insolvable difficulty.

comprehensive impact of the entire record. That is what ultimately resolves this decisive credibility issue against the plaintiff. This Court holds, based upon the aforesaid findings of fact and adopting Judge Weinfeld's previous conclusions of law,[10] that the ruby and sapphire rings advertised and offered for sale more than one year prior to the filing of the application for the '818 patent, embodied the teachings of the '245 patent and are prior art references, rendering the '818 teachings obvious, and the '818 patent invalid under 35 U.S.C. § 103.

## THE INJUNCTIVE ORDER

This Court shall, in strict compliance with the mandate of the United States Court of Appeals for the Federal Circuit, reword the terms of Judge Weinfeld's injunctive order to specify the defendants' "acts which would, if not enjoined, constitute palming-off under New York common law."[11] In carrying out this duty, this Court adopts and is limited by the factual findings and legal conclusions of Judge Weinfeld in his two opinions in this case, *supra.*

## CONCLUSIONS

In accordance with the aforesaid findings, conclusions, and judgment, it is

ORDERED, that judgment upon the plaintiff's claim grounded in his patent issued on October 6, 1981 (the '818 patent) be entered in favor of the defendants, and the said claim is hereby dismissed, and it is further

ORDERED, that defendants, their agents, employees, representatives, affiliates, assigns and any and all persons and entities acting on behalf of, or in concert with, the foregoing are permanently enjoined from misrepresenting, orally or in writing, that any article of jewelry manufactured or sold by Jeff Cooper or Jeff Cooper, Inc. was manufactured by, originates with or is approved or sponsored by Gemveto Jewelry Co., Inc.; and, it is further

ORDERED, that defendants, their agents, employees, representatives, affiliates, assigns and any and all persons and entities acting on behalf of, or in concert with, the foregoing are permanently enjoined from misrepresenting, orally or in writing, that the the precious metal content, or type, size, weight, or grade of color of gemstones of any article of jewelry manufactured or sold by Jeff Cooper or Jeff Cooper, Inc. is identical to the corresponding characteristic of any similar appearing jewelry item of Gemveto when such is not the case; and, it is further

ORDERED, that defendants, their agents, employees, representatives, affiliates, assigns and any and all persons and entities acting on behalf of, or in concert with, the foregoing are permanently enjoined from reproducing any Gemveto advertisement that illustrates an item of jewelry manufactured by Gemveto Jewelry Co., Inc., which advertisement is known by Jeff Cooper or Jeff Cooper, Inc. to have been prepared by or for Gemveto Jewelry Co., Inc. for use in the advertising or promotion of Gemveto's jewelry, and using said reproduction with any trademark, trade name, logo, or other identification of Jeff Cooper or Jeff Cooper, Inc. so as to falsely or deceptively indicate that said item of Gemveto jewelry was manufactured by Jeff Cooper or Jeff Cooper, Inc.; and, it is further

ORDERED, that defendants, their agents, employees, representatives, affiliates, assigns and any and all persons and entities acting on behalf of, or in concert with, the foregoing shall apply or cause to be applied to each item of jewelry manufactured and sold by Jeff Cooper or Jeff Cooper, Inc. a trademark registered, or applied for registration, to Jeff Cooper or Jeff Cooper, Inc., by the same means as that used in applying the quality mark or stamp appearing thereon, in type or lettering at least as large as that used in such quality mark or stamp and in a position as close as

---

10. *Gemveto Jewelry,* 568 F.Supp. at 323–28.

11. *Gemveto v. Cooper,* 800 F.2d at 259.

possible to that quality mark or stamp in accordance with 15 U.S.C. Section 297(b).

SO ORDERED.